**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MERRILL IRON & STEEL, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-221 |
| | ) | |
| BLAINE CONSTRUCTION | ) | |
| CORPORATION, *et al.*, | ) | |
| Defendants. | ) | |

**OPINION**

ROBERT C. MITCHELL, United States Magistrate Judge

Presently pending is a Motion for Partial Summary Judgment filed on behalf of cross-

claimant HOH Engineers, Inc. ("HOH") [ECF No. 244]. A Brief in Opposition has been filed by

cross-defendant Blaine Construction Corporation ("Blaine") [ECF No. 257] to which HOH has

replied [ECF No. 261]. For the reasons stated herein, the motion will be granted but entry of final

judgment will be held in abeyance.

**I.       Introduction**

This case concerns the construction of a $1.2 billion rolled-metal processing and water-

treatment facility for Defendant Allegheny Ludlum Steel Corporation ("ATI") in Brackenridge,

Pennsylvania (the "Project"). On or about June 6, 2011 ATI contracted with Defendant Blaine to

design and build a portion of the Project.   In January of 2011 Blaine subcontracted with HOH, an

engineering firm, to provide preliminary design services for the Project.  Disagreements arose as to

whether the Project complied with the tolerance requirements in Blaine's contract with ATI.

1

The Complaint in this action was filed of February 14, 2014. [ECF No. 1]. On August 18, 2014, the parties filed a Consent Motion [ECF No. 111] to consolidate this action with *Blaine Construction Corporation v. Allegheny Ludlum, LLC, et al.*; Case No. 2:14-cv-00689-RCM (the "Blaine Action"). Blaine has alleged claims against HOH for professional negligence and breach of contract seeking damages in excess of $5 million; a portion of those claims are purported to be covered by professional errors and omissions insurance. On September 3, 2014, HOH filed an amended cross claim in which it seeks recovery for amounts allegedly owed to it by Blaine for five categories of services rendered.

HOH now seeks partial summary judgment against Blaine as to two of those categories: 1) services provided pursuant to written change orders signed by both parties (approximately $44,000); and 2) services consisting of Revisions after Initial Design (approximately $399,000). HOH asserts it is entitled to final judgment in the amount of $440,384.62, together with interest thereon at an annual rate of 6%. Blaine contends it had contracted the right to withhold payment from HOH for deficient work, and asserts withholding and setoff as affirmative defenses to HOH's claims. [ECF No. 116 at 7].

At this juncture no trial date has been set. Certain parties have previously indicated that they may request to proceed with expert discovery. The court has a status conference scheduled for January 23, 2017.

II.   **Factual Background**

The following facts are not in dispute, unless otherwise noted. The first contract between the parties was a written subcontract ("the Preliminary Design Work Subcontract") wherein HOH

agreed to provide preliminary design services for the ATI Project for a flat fee of $108,000. [ECF

No. 246 at ¶2]. HOH performed that work, and was paid the agreed-upon $108,000 fee. Id.

Blaine and HOH next entered into a second written subcontract, dated July 26, 2011 ("the

Blaine/HOH Subcontract") pursuant to which HOH was retained to perform the remainder of the

engineering work for the ATI Project. [ECF No. 246 at ¶3.] The original Blaine/HOH Subcontract

price was $798,000 for basic services. [ECF No. 258 at 20].

The Blaine/HOH Subcontract contains a provision (Section 6.3.5) permitting Blaine to

withhold amounts due to HOH under certain conditions. [ECF No. 246 at ¶8.]  It provides:

> Should the Design Professional [HOH] or its consultants or subcontractors cause
> damage to the Project, or fail to perform or otherwise be in default under the terms of
> this Agreement, the Design-Builder shall have the right to withhold from any
> payment due or to become due, or otherwise be reimbursed for, an amount sufficient
> to protect the Owner and Design-Builder from any loss that may result. Payment of
> the withheld amount shall be made when the grounds for withholding have been
> removed.

[ECF No. 114-1 at 13; ECF No. 246 at ¶ 8).

At the time the parties entered into the Blaine/HOH Subcontract, the design services that

HOH agreed to provide were the "basis of design" of the mill, according to HOH. [ECF No. 246 at

¶5, ECF No. 258 at 4.]  Blaine states that as is evident from the Blaine/HOH Subcontract, the

parties intended that additional design services would be performed by HOH to finalize the design

including, among other things, schematic design documents (Section 3.2.1), design development

documents (Section 3.2.2), and construction documents (Section 3.2.3).  [ECF Nos. 114-1 at 5-6,

258 at 4.]

HOH provided design services to Blaine for the ATI Project pursuant to the Blaine/HOH

Subcontract. [ECF No. 246 at ¶6.] The ATI Project was a "fast-track" job, which meant that HOH

was required to release drawings for portions of the initial design as each was completed, rather than waiting until the initial design of all portions of the plant was completed and then releasing all of the drawings for the initial design at the same time. [ECF No. 246 at ¶33.] Substantial changes to the ATI Project were made by the owner, by Blaine, and by others during the course of HOH's provision of services pursuant to the Blaine/HOH Subcontract, including changes that resulted in (a) HOH being required to prepare a final design that was, in many respects, significantly different from the preliminary design that HOH had prepared pursuant to the January, 2011 Preliminary Design Work Subcontract and (b) many other substantial changes to numerous design calculations, modeling, and drawings that HOH had prepared and sent to Blaine and/or other subcontractors as part of the initial design pursuant to the Blaine/HOH Subcontract. [ECF No. 246 at ¶7.]

Blaine explains that a "large" number of those changes occurred after Merrill had been released to begin fabrication (and after steel had been fabricated). See Affidavit of Ray Duncan ("Duncan Aff.") [ECF No. 259-2 at ¶ 8.] HOH has acknowledged that the changes included some revisions to the drawings to remedy HOH's own errors or incomplete work. [ECF No. 259-1 at pp. 158-161.]   Recordkeeping in this regard appears to have been less than ideal.  HOH acknowledged that it did not highlight all of the revisions to the drawings and that it did not make any notes or otherwise advise Blaine as to the reason for some of the revisions. See Deposition of Nicholas Raskovich ("Raskovich Dep.") [ECF No. 259-3 at pp. 375-379.] Mr. Raskovich testified that while changes on HOH drawings on this job were (as is the industry norm) typically clouded by HOH, the reasons for the changes were not indicated. He testified that "normally we cloud all of the changes and indicate the reason for the change," but that on this job, while the changes were  clouded "we didn't indicate the specific reason behind the change. And the reason was, there was a lot of changes

that were taking place….our engineers informed me it was difficult to keep track of all that stuff.

That's the way I understood it." [ECF No. 259-3 at p. 379.]

A dispute arose between Blaine and HOH: Blaine alleged that HOH had committed

professional errors and/or omissions that rendered HOH liable to Blaine.  [ECF No. 246 at ¶9.]  As

a result, according to HOH, Blaine began to withhold payments to HOH pursuant to Section 6.3.5

of the Blaine/HOH Subcontract, but demanded that HOH nevertheless continue to provide design

services that were needed to complete the Project. [ECF No. 246 at ¶10.] HOH, which denied that it

had committed any professional errors or omissions that would render it liable to Blaine, wanted to

be timely paid for the work that it had already performed, as well as for any future work. [ECF No.

246 at ¶11.]

The Blaine/HOH Subcontract was subsequently modified by (a) 18 written change orders

signed by both parties, and according to HOH it was also modified by  a written agreement

contained in an exchange of e-mails on April 20 and 24, 2012 ("the April, 2012 Agreement'). [ECF

No. 246 at ¶4.] Blaine disputes that that there are any other modifications to the Subcontract and

further disputes that the email exchange of April 20 and 24, 2012 is a written agreement between

HOH and Blaine or a modification of the Subcontract; rather, it is an exchange of emails between

attorneys who were attempting to resolve the dispute.

Regardless, there is no dispute that parties were attempting to resolve the issues and to

ensure the Project continued to progress by entering into the April, 2012 Agreement. [ECF No. 246

at ¶12.] In it HOH agreed to continue to provide services for the ATI Project and, in return, Blaine

agreed (a) to immediately pay HOH all past due amounts and (b) in the future, not to offset against

any amounts owed to HOH any amount of damage that Blaine might claim to have incurred as a

result of any alleged professional errors or omissions by HOH. [ECF No. 246 at ¶12.] Instead, Blaine agreed to reserve its rights to subsequently recover back any amounts to which it could prove entitlement (which, if Blaine was found to be entitled to recover, would be paid by HOH's insurance carrier, rather than by HOH).  [ECF No. 246 at ¶12.]

Pursuant to the April, 2012 Agreement, HOH continued to provide services for the ATI Project, but HOH claims that Blaine breached by failing to pay HOH as it had agreed to do. [ECF No. 246 at ¶13.] Between January 3, 2012 and March 12, 2014, HOH and Blaine entered into 18 written change orders, each of which was signed by both HOH and Blaine. [ECF No. 246 at ¶15.] According to Blaine, these change order requests were rejected in writing, some on the basis of untimeliness, and after (or because of) the inception of this lawsuit, HOH re-categorized them as "allowance" items, in what Blaine characterizes as an attempt to avoid the timeliness issue (allowances were to be reconciled at the completion of the Subcontract).  [ECF No. 258 at ¶¶ 14, 15].

The April, 2012 Agreement consisted of an exchange of e-mails between counsel for HOH and counsel for Blaine. HOH's counsel's April 20, 2012 e-mail to counsel for Blaine said:

> Ford –
>
> Ford – Thanks for your letter.  On Monday, HOH will contact Blaine to make certain that Blaine has all of the documentation it needs to get the currently outstanding amount paid.  As we agreed on the phone, it makes most sense for both parties for Blaine to pay those amounts, as well as amounts coming due in the future,  in cash, and for the parties to reserve their rights to assert whatever claims and defenses they may have to another time and to concentrate now on finishing the project.  As I said in my letter, HOH will need Blaine's written assurance that that is how it intends to proceed before HOH performs any additional services pursuant to Section 3.3 of the contract. This need not be in any formal document; an e-mail or letter from Blaine, or from you on Blaine's behalf, will suffice.
>
> Dan

[ECF No. 246 at ¶17.]

In response Blaine's counsel on April 24, 2012 said:

Dan:

Blaine will make payment to HOH for its outstanding invoices upon receipt of proper documentation. It is my understanding that Chris Troutman, Blaine's pm, has already contacted HOH's Tamas Kutas about obtaining the documentation in order to process payment. Moreover, Blaine will pay HOH for the performance of additional services pursuant to Section 3.3 of the Contract upon receiving proper documentation from HOH. Just as important is Blaine's understanding that HOH has committed to complete its work under the Contract, including performing Additional Services, in a timely manner. In particular, there are a number of urgent items that currently require HOH's attention, and Blaine understands that with this payment commitment HOH will direct the necessary resources to address these and future issues.

As we have discussed, Blaine must ensure that the Project is completed in accordance with the terms of the prime contract with the Owner; therefore, by making these payments and/or commitments to make future payments to HOH, Blaine is attempting to ensure that the Project proceeds without further interruption or delay. Blaine does not admit that the payments are due or proper; rather, Blaine is making payments to HOH subject to a full reservation of any and all rights, obligations, claims, defenses and remedies of any nature whatsoever related to this matter, including the recovery of these amounts from HOH or its insurer.

Thanks,
Ford

[ECF No. 246 at ¶ 17.]

The Blaine/HOH Subcontract provides, in pertinent part:

For Basic Services as described in section 3.2, the Design-Builder [*i.e.*, Blaine] shall compensate the Design Professional [*i.e.*, HOH] on the following basis... :

6.1.1.1   Stipulated Fee in the amount of <u>Seven Hundred Ninety Eight Thousand</u> dollars (<u>$798,000.00). This fee includes the following allowances which will</u> <u>be adjusted based on actual costs at the end of the P</u>roject:
a.  Shop Drawing Review – $55,000
b.  RFI Responses – $10,000
c.  As-Built Drawings – $40,000

d. Revisions after Initial Design –   $10, 000
e.  Travel Expenses – $48,000.00.

[ECF No. 246 at ¶ 18.]   The Blaine/HOH subcontract also provided for hourly billing rates.  [ECF

No. 246 at ¶ 19.]  At the agreed-upon hourly billing rates, the work that HOH did on the ATI

Project pursuant to the Blaine/HOH Subcontract for Revisions after Initial Design came to

$409,178.11; there were a large number of complicated changes to the project.  [ECF No. 246 at ¶

21.] HOH contends it fully performed pursuant to the Blaine/HOH Subcontract until Blaine

breached by failing to pay HOH what it was due at the end of the ATI Project; Blaine contends

HOH's did not fully perform because it failed to provide the as-built drawings and calculations.

[ECF No. 246 at ¶ 20, ECF No. 258 at 13].  Blaine also contends there is a genuine issue of

material fact as to whether HOH is entitled to such a payment for revisions after Initial Design

because, contrary to industry norms, HOH's recordkeeping did not track changes made to the

construction drawings which were done to correct HOH"s own errors and/or which were done at

the behest of others involved in the project.

When changes to the ATI Project by the owner, by Blaine and by others began to require

HOH to provide services consisting of Revisions after Initial Design in excess of the $10,000

allowance for such work that was included in the $798,000 Stipulated Fee, HOH, desiring to be

paid currently for such work, began submitting change order requests to Blaine for that work. [ECF

No. 246 at ¶ 22.]

On April 11, 2012, Blaine informed HOH that it would not approve 22 HOH change order

requests for Revisions after Initial Design work that HOH had submitted to Blaine between

November 11, 2011 and February 6, 2012. [ECF No. 246 at ¶ 23.]   Blaine also appears to have sent

these change order requests to the owner, ATI, because Blaine viewed them – if valid – as being

ATI's responsibility. ATI rejected them primarily on the grounds of not timely submitted. [ECF

No. 258 at ¶13].

According to HOH, at the hourly billing rates, the value of the revisions after Initial Design

work as described in the 22 change order requests is $262,700.39; the value of the time billed by

HOH personnel for such work (and not subject to any proposed change order request) is

$146,477.72; thus the total value is $409,178.11. Accounting for the $10,000 included within the

$798,000 Stipulated Fee in the Blaine/HOH Subcontract, HOH contends it is due $399,178.11.

[ECF No. 246 at ¶25.] Blaine cites to Section 6.3.5 of the contract, which allows Blaine to

withhold amounts from payments due to HOH for damages that are caused by HOH's deficient

performance. Blaine States it is due over $5 million dollars due to the errors, omissions and

inconsistencies in HOH's design. [ECF No. 258 at ¶17.]

Blaine asserts that HOH's project manager Nick Raskovich manipulated the time entries and

costs so that time from other activities was allocated to "not to exceed" change orders agreed to by

Blaine in order to maximize the change order amount paid by Blaine; HOH denies this. [ECF No.

261-1 at 9]. According to HOH, the change order at issue was a fixed-price change order wherein

HOH was to be paid a fixed price for the work described in that change order regardless of how

many hours were billed to it, and HOH stood by its agreement to perform the base contract work

for a flat fee of $798,000 even though the value of the time HOH spent exceeded that. [ECF No.

246 at ¶31].

The contractual dispute between the parties is more complicated than the issues presently

before us, and HOH seeks partial summary judgment on two narrow portions of the contracts cited

in their crossclaim: (a) the services provided pursuant to the written change orders signed by both parties and (b) the services consisting of Revisions after Initial Design, arguing there is no genuine issue of material fact[1] and HOH is entitled to judgment in its favor as a matter of law in the amount of $440,384.62 together with interest thereon at the annual rate of 6%.

The matter is now ripe for disposition. All parties have consented to proceed before the undersigned pursuant to 28 U.S.C. § 636(c).

III.    **Standard of Review**

Summary judgment is appropriate where there is no genuine issue of material fact as to a particular claim or any part of a claim, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). While the non-moving party is entitled to have all inferences drawn in its favor, to prevail the "opposing party may not rest upon the mere allegations in or denials of the pleadings; its response . . . must set forth specific facts showing there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). A genuine factual dispute is "material" to the claim or issue on which summary judgment is sought only if it might affect the outcome of the claim or issue under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Thus, to withstand summary judgment, a non-moving party must demonstrate the existence of evidence that would support a judgment in its favor at trial on the issue. *Id.; Saldana*, 260 F.3d at 232.

---

1       HOH's amended crossclaim seeks recovery for amounts that HOH claims are owed  it by Blaine for five categories of services rendered pursuant to the Blaine/HOH Subcontract: (1) services provided pursuant to written change orders signed by both parties, (2) services consisting of Revisions after Initial Design, (3) services consisting of RFI Responses, (4) services consisting of Shop Drawing Review, and (5) Travel Expenses. [ECF No. 246 at ¶14.]

## IV. Discussion

### A. Written Change Orders

HOH first argues that it is entitled to judgment in the amount of $41,206.51 plus prejudgment interest for services provided pursuant to written change orders. At the outset we note that Blaine has corrected this calculation by pointing out that HOH has overbilled Blaine (and Blaine overpaid) for Construction Phase Services by $7,350 [ECF No.257 at 4-5]; HOH has admitted to the inadvertent overbilling, [ECF No.261-1 at 2] and accordingly revised the number to $33,856.51 which it claims it is entitled to recover for change order work. [ECF No. 261 at 2; ECF Nos. 259-7 and 259-9 (invoices)].

There does not appear to be any record evidence to establish that this particular subset of work was performed to Blaine's satisfaction, nor is there a dispute that Blaine has not paid what it agreed to pay for the work in and of itself. Blaine nevertheless opposes the payment on the grounds it has claims against HOH for professional errors and/or omissions that exceed that amount. Blaine claims it had overpaid HOH by more than $41,206.51 because: (1) HOH had billed for and been paid for as-built drawings that were not provided by HOH as required by the Subcontract; and (2) Blaine overpaid HOH for Construction Phase Services, as mentioned above. See Affidavit of Vice President-Operations Manager Mark Brodd ("Brodd Aff.") [ECF No. 259-4 at ¶¶ 6-10.] Further, Blaine states that despite having overpaid HOH for services not performed and in excess of what had been earned by HOH, in April 2014 Blaine nevertheless offered to pay HOH the $41,206.51 if HOH agreed to provide the as-built drawings and calculations. See Brodd Aff., ¶ 10; Mark Brodd email to Tamas Kutas dated April 16, 2014 [ECF No. 259-5 at 2]. However, HOH did not provide as-built drawings that conformed to the requirements of the Subcontract or the required

calculations. The Blaine/HOH Subcontract required HOH to provide Building Information

Modeling ("BIM") files for as-built drawings, but HOH ultimately only provided .pdf files that did

not meet the Subcontract requirements. See Brodd Aff. at ¶ 10. Moreover, Section 9.1 of the

Subcontract expressly provides that HOH shall continue to perform its services while disputes are

pending, unless otherwise agreed to in writing by the parties. See Doc. 114-1, p. 16, Section 9.1.

HOH's Chief Operating Officer Tamas Kutas acknowledged that HOH did not provide all

the deliverables as required, including the as-built drawings and calculations. Yet HOH argues the

whole point of the April, 2012 Agreement was that Blaine would not withhold payment and that,

instead, Blaine would immediately pay HOH and would reserve its right to later recoup from

HOH's insurance carrier in this lawsuit any amount to which the Court may hold that Blaine is

entitled as a result of any alleged professional errors and/or omissions. As to its failure to provide

the as-built drawings, HOH states that Blaine breached the Baine/HOH Subcontract first. HOH

then cites the legal proposition that once a party to a contract commits a material breach, the other

party no longer has a duty to perform. *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639,

648 (Pa. 2009). HOH contends that had it moved for summary judgment as to its entire claim and

had we granted said motion, it would have been appropriate for the Court to include in the judgment

an exchange of the as-built drawings (which normally are provided at the end of a project

regardless) for the payment from Blaine. Instead, HOH only seeks a limited judgment as to the work

it performed pursuant to these change orders signed by Blaine. The remainder of its claims will be

subject to a jury trial or settlement

We find that summary judgment is appropriate. "It is true that Pennsylvania courts have

"long recognized the established precept of contract law that a material breach of a contract relieves

the non-breaching party from any continuing duty of performance thereunder." *J.K. v. Council Rock School Dist.*, 833 F.Supp.2d 436, 454 (E.D. Pa. 2011); see also LJL Transp. 962 A.2d 639 at 648 (Pa. 2009) ("It is equally well established, that ' [a] party also may not insist upon performance of the contract when he himself is guilty of a material breach of the contract.' ")).The uncontroverted evidence is that HOH is owed $33,856.51 for work it performed while the Project was ongoing, to the benefit of Blaine and others, despite not having handed over the as-built drawings to Blaine at the end of the project. The wording of the April, 2012 Agreement is clear and unambiguous, and Blaine should pay HOH for the change order work in accordance with the earlier agreement.

## B. Revisions after Initial Design

Next. HOH argues there is no genuine issue of material fact that it is entitled to judgment in its favor for the Revisions after Initial Design work (some as described in the 22 rejected change order requests and some as tracked by HOH personnel), and that it is entitled to that amount now, rather than at the end of this lawsuit, regardless of how Blaine's claims against HOH might ultimately be decided.

The record evidence establishes that $146,477.72 of the Revisions after Initial Design work for which HOH is seeking summary judgment was never the subject of any change order request. The HOH personnel billed their time as to this category to a special cost code. [ECF No. 246 at ¶ 25, ECF No. 261 at 20].

The remainder of the value of the Revisions after Initial Design work that HOH seeks to recover, $262,700.39, was described in the 22 rejected change order requests at the hourly billing rates set forth in Exhibit D to the Blaine/HOH Subcontract. As previously explained, when changes to the ATI Project by the owner, by Blaine and by others began to require HOH to provide

13

services consisting of Revisions after Initial Design in excess of the $10,000 allowance for such

work that was included in the $798,000 Stipulated Fee, HOH, desiring to be paid currently for such

work, began submitting change order requests to Blaine for that work. [ECF No. 246 at ¶ 22.]

Blaine refused to issue the requested change orders on April 11, 2012 (the requests having been

submitted between November 11, 2011 and February 6, 2012.) The terms of the Blaine/HOH

Subcontract at Section 6.1.1.1 required HOH to wait to be paid for that work until the end of the

Project, and it is undisputed that the Project ended no later than July 8, 2014 [ECF No. 246 at ¶ 24].

Despite this delay, HOH retained its contractual right to be paid for this work.

Many of the arguments put forth by Blaine in opposition to the motion for summary

judgment are not on point. Although Blaine has argued that the design changes were not

appropriately marked on the drawings, it has not provided affirmative record evidence that the work

billed consists of correcting HOH errors. To withstand summary judgment, the non-moving party

must demonstrate the existence of evidence that would support a judgment in its favor at trial on the

issue. The evidence provided by CEO Tamas Kutas, who stated that all of the $399,178.11 HOH

seeks to recover is for work that was necessitated by the numerous changes to the project made by

the owner, by Blaine, and by others, remains uncontroverted.[2] After a careful review of the record,

we agree with HOH that the evidence cited by Blaine relates to two other contractual categories of

work under Section 6.1.1.1: RFI Responses and Shop Drawing Review. [ECF No. 259-1].

Furthermore, Blaine attempts to cast doubt on HOH's additional services in allowance claims by

noting an internal HOH email dated December 29, 2011 from HOH's Fred Owens wherein he

acknowledged assigning basic service hours to "travel allowance." The Travel Expense category is

---

2 The record evidence establishes that all of the work described in the 22 rejected change orders fell within the
allowance category for Revisions after Initial Design, even though HOH's change order requests were amended at some

not at issue in this motion for partial summary judgment.  In addition, we note Blaine asserts project

manager Nick Raskovich manipulated time entries and costs; this is irrelevant because it does not

address the category Revisions after Initial Design work.  That change order number 56 was a fixed-

price change order; regardless of how many hours were billed to Blaine, it would not have affected

Blaine's bottom line.  (In fact, HOH has limited its demand to the agreed-upon stipulated fee for

that work category of work (Section 6.1.1.1) even though the hourly billing rates for the work value

it at $325,632.54 over and above the $798,000 stipulated fee).

Accordingly, we find that there is no genuine issue of material fact that HOH is entitled to

recover the amount of $399,178.11 for Revisions after Initial Design work.

### C.  Rule 54(b) Judgment

HOH has asked that we enter final judgment.  We decline to do so.  The pendency of

Blaine's counterclaim necessitates that we do not enter final judgment on HOH's claims until the

counterclaim has been adjudicated.

Rule 54(b) expressly provides:

> **Judgment on Multiple Claims or Involving Multiple Parties.** When an action
> presents more than one claim for relief – whether as a claim, counterclaim,
> crossclaim, or third-party claim – or when multiple parties are involved, the court
> may direct entry of a final judgment as to one or more, but fewer than all, claims or
> parties only if the court expressly determines that there is no just reason for delay.
> Otherwise, any order or other decision, however designated, that adjudicates fewer
> than all the claims or the rights and liabilities of fewer than all the parties does not
> end the action as to any of the claims or parties and may be revised at any time
> before the entry of a judgment adjudicating all the claims and all the parties' rights
> and liabilities.

Rule 54(b) permits district courts to "direct entry of a final judgment as to one or more, but

fewer than all, claims ... [but] only if the court expressly determines that there is no just reason for

_____

point. See Section 6.1.1.1 of the Blaine/HOH Subcontract.

delay." Fed. R. Civ. P. 54(b). As the Third Circuit recognized, "[c]ertification of a judgment as final under Rule 54(b) is the exception, not the rule, to the usual course of proceedings in district courts." *Elliott v. Archdiocese of New York,* 682 F.3d 213, 220 (3d Cir. 2012). This rule "'attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties.'" *Id.* Under Rule 54(b), a court must make two findings to direct entry of a final judgment on a claim. First, it must determine that the judgment is final "in the sense that it is 'an ultimate disposition of an individual claim entered in the course of [a] multiple claims action.'" *Sussex Drug Prod. v. Kanasco, Ltd*., 920 F.2d 1150, 1153 (3d Cir.1990) (quoting *Curtis–Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980)). Second, the court must determine that there is no just reason for delay. *Berckley Inv. Grp., Ltd., v. Colkitt,* 455 F.3d 195, 202 (3d Cir. 2006).

To determine whether there is "just reason for delay," under Rule 54(b), this Circuit instructed district courts to consider the following factors:

> (1) the relationship between the adjudicated and non-adjudicated claims;
>
> (2) the possibility that the need for review might be mooted by future developments;
>
> (3) the possibility that the reviewing court might be obliged to consider the same issue a second time;
>
> (4) the presence or absence of a claim or counterclaim that could result in set-off against the judgment sought to be made final; and
>
> (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of the trial, frivolity of competing claims, expenses and the like.

*Allis–Chalmers Corp. v. Phila. Elec. Co.*,521 F.2d 360, 364 (3d Cir.1975), overruled in part by

*Curtis–Wright Corp.*, 446 U.S. at 6–7; *see also In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143,

164 (3d Cir. 2005) (concurring opinion); *Myers v. Medical Ctr. of Del.*, 28 Fed.App'x. 163, 166 (3d

Cir .2002); *Berckeley Inv. Group, Ltd. v. Colkitt*, 259 F.3d 135, 144–45 (3d Cir. 2001); *Waldorf v.*

*Shuta*, 142 F.3d 601, 609 (3d Cir.1998).

Here, Blaine has asserted a right to setoff against HOH in excess of $5 million, and at this

juncture, it is probable that the merits of HOH's claims (subject to the motion for partial summary

judgment) will be relevant to Blaine's setoff claims. This is different from the issue of whether

Blaine had a right to withhold payment from HOH after the parties entered into the April, 2012

Agreement.  HOH has remaining unadjudicated claims, as does Blaine, and the issues are too

connected to warrant final judgment. Should there be an appeal, there is a high possibility that a

reviewing court would be obliged to consider the same issue a second time, given the complexity of

the overall case. Given that entry of such an order is the exception and not the rule, and given the

interconnected nature of the contractual disputes, final judgment is not appropriate at this time. *See,*

*e.g., Kurz–Kasch, Inc. v. Holtzberg*, 2006 WL 561918, at *3,  (D.N.J. Mar. 7, 2006) (granting

partial summary judgment, despite the possibility of offset, but denying Rule 54(b) certification).

Therefore, the grant of partial summary judgment will not be entered as a final judgment

under Rule 54(b).  The court makes no final determination as to any prejudgment interest on the

amounts due and owing, or whether HOH is a prevailing party  for purposes of the fee-shifting

provision in the Blaine/HOH Subcontract.

## V.     <u>Conclusion</u>

Accordingly, for the reasons stated herein, the motion for partial summary judgment is granted but final judgment will be held in abeyance.

An appropriate Order follows.

Date:  January 20, 2017

/s/  *Robert C. Mitchell*
Robert C. Mitchell
U.S. Magistrate Judge

cc:  record counsel via CM-ECF

MERRILL IRON & STEEL, INC.,      )
     Plaintiff,                 )
                            )
         v.                )        Civil Action No.: 14-221
                            )
BLAINE CONSTRUCTION     )
CORPORATION, *et al.*,       )
     Defendants.          )

## **ORDER**

AND NOW, to-wit, this 20th day of January, 2017, for the reasons stated in the Opinion filed contemporaneously herewith, it is hereby ORDERED, ADJUDGED and DECREED that the Motion for Partial Summary Judgment filed on behalf of HOH Engineers, Inc. [ECF No. 244] be and the same hereby is GRANTED.  Entry of final judgment is held in abeyance.

/s/   *Robert C. Mitchell*
Robert C. Mitchell
U.S. Magistrate Judge

cc:  record counsel via CM-ECF